# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DIANE KERSEY,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00045 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Diane Kersey, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Kersey's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

Case 2:08-cv-00045-GMW-PMS   Document 15   Filed 03/24/09   Page 1 of 39   Pageid#: 61

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kersey protectively filed her applications for DIB and SSI on August 22, 2005, alleging disability as of September 30, 2000, (Record, ("R."), at 77-81, 88, 262-71), due to degenerative disc disease, high blood pressure, Tourette's syndrome, acid reflux, liver problems, high cholesterol, nervousness, panic attacks, inability to concentrate, forgetfulness and tendinopathy in the left shoulder. (R. at 91, 106-07.) The claims were denied initially and upon reconsideration. (R. at 34-46, 52-55.) Kersey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 56, 272.) A hearing was held on April 25, 2007, at which Kersey testified and was represented by counsel. (R. at 341-66.)

By decision dated May 25, 2007, the ALJ denied Kersey's claims. (R. at 14-25.) The ALJ found that Kersey met the insured status requirements of the Act for DIB purposes through December 31, 2005. (R. at 19.) The ALJ also found that Kersey had not engaged in substantial gainful activity since September 30, 2000, the alleged onset date of disability. (R. at 19.) The ALJ determined that the medical evidence established that Kersey suffered from severe impairments, namely degenerative disc disease and degenerative joint disease of the left shoulder. (R. at

-2-

19.)  However, he found that Kersey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 20.)  After consideration of the medical evidence, the ALJ determined that Kersey retained the residual functional capacity to perform a full range of light,[1] unskilled work.  (R. at 20.)  In addition, the ALJ found that Kersey was capable of performing her past relevant work as a deli clerk and cashier, noting that the past work did not require the performance of work-related activities precluded by her residual functional capacity.  (R. at 24.)  Thus, the ALJ concluded that Kersey was not under a disability as defined in the Act and was not entitled to benefits.  (R. at 25.)

After the ALJ issued his decision, Kersey pursued her administrative appeals and sought review of the ALJ's decision, (R. at 13), however, the Appeals Council denied her request for review.  (R. at 6-9.)  Kersey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. §§ 404.981, 416.1481 (2008).  This case is now before the court on Kersey's motion for summary judgment, which was filed January 30, 2009, and on the Commissioner's motion for summary judgment, which was filed February 26, 2009.

## *II. Facts*

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If an individual can do light work, she also can do sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

-3-

Kersey was born in 1955, (R. at 77, 131), which classifies her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). According to the record, it appears that Kersey has a high school education, as well as two years of college courses. (R. at 95.) Kersey has past relevant work experience as a cashier and as a deli clerk. (R. at 97.)

At the hearing before the ALJ on April 25, 2007, Kersey testified that she was last employed in 2000 as a deli clerk. (R. at 351-52.) She explained that she was forced to quit work because of back pain. (R. at 352.) Kersey testified that, due to her lower back pain, she could not sit or stand for longer than one hour, noting that, at that point, her pain increased. (R. at 352.) She further testified that she experienced constant pain, explaining that sitting, standing or walking for extended periods exacerbated the pain. (R. at 352.) Kersey stated that when her pain increased she had to sit or lie down, indicating that lying flat on her back was the only thing that relieved the pain. (R. at 352.) She described her pain as a crushing, stabbing, burning and intense pain that increased as it moved down her back and into her leg. (R. at 352-53.) Kersey commented that the pain extended to her leg two to three times per week, especially if she sat, stood or walked for extended periods. (R. at 353.) She stated that, when the pain increased, causing her to lie down, it normally took 45 minutes for the pain to subside. (R. at 353.) However, Kersey testified that the pain was never completely gone. (R. at 353.) She further testified that she treated her back pain with medication. (R. at 354.)

Kersey indicated that her pain prohibited her from functioning, noting that it routinely forced her to get off of her feet. (R. at 354.) She recalled situations in

public places in which she had to lie down on the floor because she could not walk. (R. at 354.) Kersey stated that her condition caused her to basically stay at home. (R. at 354.) Kersey further explained that her pain affected her ability to do housework, alleging that she could no longer mop, vacuum, wash dishes or do laundry. (R. at 355.) She also indicated that her cooking was limited to operating the microwave oven. (R. at 355.) Kersey testified that walking up a hill or stairs increased her pain. (R. at 355.) Although she acknowledged that she was able to drive, Kersey explained that she could not drive for more than one half hour at a time. (R. at 355.) She stated that she avoided driving due to panic attacks that impacted her ability to function. (R. at 355.) Kersey stated that she also experienced pain in her left shoulder and arm, which limited her ability to reach forward and overhead, behind her head and behind her back due to the sharp, stabbing pain. (R. at 356.) She stated that her shoulder and arm pain was not constant, explaining that it hurt only when she used her left upper extremity. (R. at 356.) Kersey testified that her shoulder and arm pain resulted in difficulties with grocery shopping and in performing personal tasks such as dressing or washing her hair. (R. at 356-57.)

Kersey testified that she experienced panic attacks once or twice a week. (R. at 357.) She stated that a typical attack usually lasts for approximately one hour, causing her to sweat, shake and experience blurred vision. (R. at 357-58.) Kersey also indicated that the attacks caused stomach sickness and increased her heart rate and blood pressure. (R. at 357.) Kersey testified that she had Tourette's syndrome, which caused facial twitching, nervousness and shaking. (R. at 358.) She acknowledged that the condition was more severe when she was a child, but noted that she continued to experience attacks. (R. at 358.)

Kersey opined that her back pain had worsened since 2005, explaining that her abilities are now more limited. (R. at 358.) She noted that her back pain was not as severe in 2000, stating that, at that time, she could move around and walk for about four hours. (R. at 359.) Kersey testified that, since that time, her abilities have decreased, limiting her ability to walk to approximately a half hour to one hour and a half. (R. at 359.)

When asked about her activities of daily living, Kersey stated that a typical day consisted of preparing a meal in the microwave, lying on the couch and watching television or reading a book. (R. at 360.) She stated that she did not get out much and that she did not perform housework. (R. at 360.) Kersey testified that her daughter performed the housekeeping duties and helped her shop. (R. at 360.) Kersey opined that she could lift no more than 10 pounds with her right hand and that she could lift virtually nothing with her left hand due to the pain. (R. at 361.)

Robert W. Jackson, a vocational expert, also testified at Kersey's hearing. (R. at 364-65.) In order to clarify some information regarding Kersey's work history, Jackson asked Kersey to discuss her previous work as an order consultant in a clothing store. (R. at 364.) Kersey explained that the job lasted for a short time and required her to take orders by telephone. (R. at 365.) She stated that she could not continue working there because it required her to sit the entire day. (R. at 365.) Jackson classified Kersey's past work as a cashier and a deli clerk as light, unskilled work and her job as a telephone order clerk as sedentary,[2] semiskilled work. (R. at 365.)

_____

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).

In rendering his decision, the ALJ reviewed medical records from the Free Clinic of Virginia; the Department of Social Services; Village Family Physicians; Dr. Richard Newton, M.D.; Radiology Consultants of Lynchburg; Rehabilitation Associates of Central Virginia; Centra Health, Inc.; Dr. Alston W. Blount, Jr., M.D., a state agency physician; Blue Ridge Therapy Associates; Dr. Kevin Sahli, M.D.; Orthopaedic Center of Central Virginia; Neurology Associates of Lynchburg, Inc.; Dr. Richard M. Surrusco, M.D., a state agency physician; Central Virginia Imaging; Dr. Kathryn L. Humphreys, M.D.; and Centra Lab. Kersey's counsel also submitted medical records from Lynchburg General Hospital to the Appeals Council.[3]

Kersey was treated at the Free Clinic of Virginia from June 21, 2001, to July 26, 2001, where she complained of back problems and was treated for acid reflux, a history of Tourette's syndrome, hypertension and a history of elevated liver functions. (R. at 145-50.)

A medical evaluation dated July 27, 2001, from the Campbell County Department of Social Services revealed a diagnosis of severe degenerative disc disease. (R. at 151-52.) Dr. David M. Woalckam, M.D., determined that Kersey could lift less than 10 pounds, sit for two to three hours, stand for two hours, walk for two hours and drive for two to three hours. (R. at 151.) Dr. Woalckam further noted that Kersey would have difficulty stooping and a minimal ability to bend. (R. at 151.) According to the medical evaluation, Kersey's impairments rendered her unable to

_____

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

participate in a job search, job skills training, education classroom instruction, job readiness training, work experience or employment. (R. at 152.) In addition, it was noted that Kersey was unable to handle small children. (R. at 152.) The medical evaluation Dr. Woalckam advised Kersey to quit her job, reduce her work hours or take a leave of absence due to health reasons. (R. at 152.) Dr. Woalckam reported that, at the end of the treatment period, Kersey would not be able to work, as he found that her limitations were permanent. (R. at 152.)

Kersey sought treatment at Village Family Physicians from July 30, 2001, to July 17, 2006. (R. at 153-76, 250-54.) On November 11, 2001, Kersey presented for a follow-up appointment regarding her high blood pressure. (R. at 160.) Her history of Tourette's syndrome also was discussed, as Kersey reported continued problems with facial jerking and twitching. (R. at 160.) Kersey also reported continuous feelings of anxiousness, symptoms of panic disorder and she was concerned that she was experiencing panic attacks. (R. at 160.) Kersey was placed on Zoloft for a trial period and laboratory testing was ordered. (R. at 160.) On February 28, 2002, Kersey reported that she did not like taking Zoloft and indicated that it had not helped her panic problems. (R. at 159.) The assessment noted disabling lower back pain, Tourette's syndrome and panic disorder. (R. at 159.) She was prescribed Prozac. (R. at 159.) On March 21, 2002, Kersey returned for a follow-up visit regarding hypatopathy and hypothyroidism. (R. at 153.) The assessment noted left-sided facial pain, which was attributed to a migraine or migraine-equivalent pain. (R. at 158.) She was continued on her regular medications and prescribed Darvocet. (R. at 158.)

On April 27, 2004, Kersey sought treatment at Village Family Physicians for

the first time in more than two years.  (R. at 157.)  She complained of acid reflux and vomiting blood.   (R. at 157.)   It was noted that Kersey suffered from severe gastroesophageal reflux disease, ("GERD").   (R. at 157.)   Kersey reported that medications such as Zantac and Pepcid did not control her symptoms.  (R. at 157.) Kersey also reported one episode of syncope, and it was suggested that the episode could have been caused by orthostasis.   (R. at 157.)   She was diagnosed with hypertension, weakness, fatigue, a urinary tract infection, esophagitis, GERD and hematemesis.  (R. at 157.)  She was prescribed medication to treat her high blood pressure, as well as Reglan and Prilosec.   (R. at 157.)   Kersey was referred to Gastroenterology Associates and sought treatment there on May 6, 2004.  (R. at 157, 174-75.)   Kersey also was treated on September 21, 2004, at which time the assessment noted menopausal symptoms with irregular menses, fatigue, hypothyroidism and controlled hypertension.  (R. at 156.)

On January 26, 2006, Kersey returned to Village Family Physicians with complaints of pain in her back, left shoulder, chest, legs and arms.  (R. at 252.) Kersey reported that she also experienced pain in the back of her head one to two times per week, which resulted in blurred vision.  (R. at 252.)  She further explained that the pain impacted her speech and caused dizziness.  (R. at 252.)  Kersey reported that she felt fatigued and stated that she experienced tingling feelings in her hands and feet. (R. at 252.) Kersey indicated that her pain had worsened, noting that none of her pain medications relieved the pain.   (R. at 252.)   Kersey alleged that the pain prevented her from performing housekeeping activities, as she explained that she was forced to sit after being on her feet for only 30 minutes.  (R. at 252.)  A physical examination revealed a decreased range of motion due to discomfort in her neck, back

-9-

and shoulders.  (R. at 252.)  She was observed to be "exquisitely" tender in her left shoulder area at the acromioclavicular, ("AC"), joint.  (R. at 252.)  It was noted that she was unable to put her arm behind her back, as it was difficult for her to raise her arm and get it even with her shoulder.  (R. at 252.)  Kersey was able to extend forward, but doing so caused discomfort.  (R. at 252.)  Kersey showed good grips equal bilaterally and her pulses were plus two.  (R. at 252.)  She was tender in the lower lumbar back area on the right side and her deep tendon reflexes were absent bilaterally in the lower extremities.  (R. at 252.)  It was suggested that Kersey schedule an appointment with a neurologist.  (R. at 252.)

Kersey returned to Village Family Physicians on June 26, 2006, with complaints of low back pain.  (R. at 251.)  Upon physical examination, Dr. Kathryn L. Humphreys, M.D., noted that Kersey had a positive straight leg raising test bilaterally, but no decreased muscle strength or sensation.  (R. at 251.)  Her reflexes were 2+ and symmetrical. (R. at 251.)  Kersey's left shoulder showed some decreased range of motion and some "cogwheeling," which Dr. Humphreys said was secondary to pain and muscle spasms.   (R. at 251.)   Dr. Humphreys recommended a neurosurgical evaluation for Kersey's back, noting that an emergency evaluation would be necessary with any increased symptoms. (R. at 251.)  Physical therapy was recommended for her left shoulder and Kersey was advised to continue her medications.  (R. at 251.)  Kersey also was instructed to restart her blood pressure medication in order to get her condition under better control.  (R. at 251.)

Kersey presented to Dr. Humphreys on July 17, 2006, and reported ongoing left-sided back pain, which radiated down into her leg.  (R. at 250.)  She described the

-10-

pain as intermittent and noted that she was hesitant to take certain medications to treat the pain because some medications caused her liver enzymes to increase. (R. at 250.) Dr. Humphreys noted that physical therapy had not been successful in the past and that chiropractic treatment did not appear to be an option with Kersey's Medicaid plan. (R. at 250.) Kersey indicated that she did not want to pursue surgical alternatives. (R. at 250.) Kersey was prescribed Ultram and discontinued her Effexor medication, as Kersey stated that she did not want to take medication for her panic disorder. (R. at 250.) Thus, despite continued symptoms, Kersey reported that she discontinued the medication because it caused feelings of paranoia and caused her to be very agitated and irritable. (R. at 250.) Kersey reported occasional palpitations in the chest area, which were associated with shortness of breath. (R. at 250.) Thus, Dr. Humphreys ordered a stress echo test. (R. at 250.)

On January 26, 2006, x-rays were taken of Kersey's left shoulder and lumbar spine. (R. at 245.) The x-ray of the left shoulder was negative and the lumbar spine x-rays showed scoliosis convex to the left with degenerative disc disease at L3-4 and L5-S1. (R. at 245.)

Kersey underwent a magnetic resonance imaging, ("MRI"), of the left upper extremity on February 20, 2006. (R. at 177.) Dr. Richard Newton, M.D., noted that the study was limited by Kersey's inability to complete the examination. (R. at 177.) However, the MRI nonetheless showed an abnormal supraspinatus tendon, which strongly suggested tendinosis or tendinopathy, and it also raised the question of a partial or intrasubstance tear. (R. at 177.) In addition, the MRI revealed degenerative changes in the AC joint. (R. at 177.)

-11-

Kersey was treated at Orthopaedic Center of Central Virginia from March 9, 2006, to June 15, 2006. (R. at 202-23.) On March 9, 2006, Kersey presented with chief complaints of left shoulder pain and lower back pain. (R. at 209.) She reported a two month history of pain in her left shoulder, noting that she experienced pain at night and with overhead activities. (R. at 209.) She complained of a chronic history of back pain, which she said had been 12 years in duration. (R. at 209.) Kersey reported that the pain had worsened, becoming progressively more severe and intense. (R. at 209.) She further stated that the pain radiated down both her legs into her calves. (R. at 209.) Upon examination, Kersey showed a full, painless and supple range of motion in the neck. (R. at 209.) Kersey's range of motion in her shoulders was nearly at a full range and she had no AC joint tenderness. (R. at 209.) Kersey was slightly tender over the proximal aspect of her humerus and her impingement maneuvers were mildly positive. (R. at 209.) Her rotator cuff strength testing was 5/5, but it did increase her pain. (R. at 209.) An examination of her back showed tenderness of the sacroiliac joints bilaterally and straight leg raises increased the pain bilaterally down her legs. (R. at 209.) Kersey's range of motion in her hips was symmetric and pain free. (R. at 209.) An x-ray of the back revealed mild degenerative changes throughout her lumbar spine with facet joint arthropathy. (R. at 210.) Kersey underwent steroid injections to treat her shoulder pain and she tolerated the procedure without any difficulty. (R. at 210.) Dr. Michael J. Diminick, M.D., noted that Kersey had impingement syndrome due to rotator cuff tendinopathy. (R. at 210.) He placed Kersey on a home exercise program and noted that if she continued to be symptomatic, he would start her on formal physical therapy. (R. at 210.) The clinical impression noted lower back pain with radicular-type symptoms. (R. at 210.) Thus, Dr. Diminick ordered an MRI of the lumbar spine, which was

-12-

performed on March 16, 2006. (R. at 210, 246.) The MRI revealed mild to moderate degenerative disc disease at L3-4 through L5-S1 and a small generalized annular bulge at L5-S1. (R. at 246.) No significant extradural defects were noted. (R. at 246.)

Kersey presented to Dr. Diminick again on March 23, 2006, for an evaluation of her back and shoulder pain. (R. at 206.) She indicated that she was experiencing persistent pain in her back, but there were no radicular symptoms. (R. at 206.) Kersey continued to experience shoulder pain, as well as difficulty performing overhead activities. (R. at 206.) A physical examination revealed findings similar to her previous visit. (R. at 206.) Dr. Diminick's clinical impression noted shoulder pain consistent with impingement and degenerative disc disease in her back. (R. at 206.) Dr. Diminick found that there was no need for an operation, but noted that, if her problems continued, he recommended that she schedule an appointment with a spine surgeon. (R. at 206.) Otherwise, he stated that he would arrange for physical therapy for her shoulder and back. (R. at 206.)

Kersey returned on June 15, 2006, reporting persistent pain in her lower back, localized over her right lumbar spine, joint and bone symptoms, memory loss and difficulty sleeping. (R. at 203, 205.) No distal radicular symptoms were observed. (R. at 205.) Kersey informed Dr. Diminick that the pain hindered her ability to move around, and she explained that she saw no improvement of her symptoms as a result of physical therapy. (R. at 205.) Upon physical examination, Dr. Diminick noted that she was in a moderate amount of distress and walked with a definite limp. (R. at 205.) Kersey had reproducible tenderness on direct palpation of her lower lumbar spine. (R.

-13-

at 205.)  A straight leg raise test was negative and she had a painless range of motion in her hips.  (R. at 205.)  Dr. Diminick administered a steroid injection in her right lower back and the procedure was tolerated without any difficulty.  (R. at 205.)  Dr. Diminick's clinical impression stated that Kersey had persistent back pain, noting that if she continued to be symptomatic, she might benefit from physiatry.  (R. at 205.)

Medical records from Centra Health, Inc., show that Kersey underwent x-rays of the lumbar spine and left shoulder on April 5, 2006.  (R. at 181-82, 260-61.)  The x-ray of the lumbar spine revealed a mild levo-curvature of the spine centered at L2-3.  (R. at 181.)  Kersey's vertebral body heights were normally maintained and the L3-4 intervertebral space was mildly narrowed.  (R. at 181, 260.)  There was no evidence of subluxation in the anteroposterior plane and no fracture was observed.  (R. at 181.)  No paraspinal soft tissue abnormality was appreciated.  (R. at 181, 260.)  The x-ray findings showed mild changes of degenerative disc disease at L3-4 and a mild levoscoliotic curvature.  (R. at 182, 261.)  An x-ray of the left shoulder showed no evidence of a glenohumeral abnormality, no osseous or articular abnormality and no abnormal soft tissue calcification.  (R. at 182, 261.)  The AC joint appeared to be intact, and it was noted that the left shoulder x-rays were negative.  (R. at 182, 261.)

On April 13, 2006, Dr. Alston W. Blount Jr., M.D., a state agency physician, completed a Physical Residual Functional Capacity, ("PRFC"), assessment finding that Kersey was able to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours

-14-

in an eight-hour workday.  (R. at 184.)  Dr. Blount further found that Kersey was unlimited in her ability to push and/or pull and that she could frequently balance, but only occasionally climb, stoop, kneel, crouch and crawl.  (R. at 185.)  No manipulative, visual, communicative or environmental limitations were noted.  (R. at 186.)  Dr. Blount noted that there were treating/examining source opinions within the record that were significantly different from his findings, but noted that such opinions were not persuasive because they were not supported by the evidence of record.  (R. at 187, 189.)  Dr. Blount determined that Kersey's allegations were only partially credible.  (R. at 188.)

Kersey received physical therapy at Blue Ridge Therapy Associates from April 21, 2006, to June 12, 2006.  (R. at 190-96, 247-49.)  A physical therapy evaluation was completed on April 21, 2006, noting that Kersey had been referred for treatment due to lower back pain.  (R. at 190-92.)  She was observed to be pleasant, cooperative and able to ambulate independently.  (R. at 190.)  She displayed severe facial grimacing during the range of motion activities and during palpation of her lower back between L1-S2, extending into the right gluteal and left gluteal upper regions.  (R. at 190.)  Sensation testing showed Kersey's light touch/proprioception to be intact in the bilateral lower extremities.  (R. at 190.)  Her overall abilities to move from position to position and her tone/motor control were independent, volitional and purposeful, however, her movements were laborious and painful due to her lower back pain.  (R. at 190-91.)  Kersey was able to ambulate independently without an assistive device, but she did show decreased pelvic rotation bilaterally and was very guarded in movements, particularly with rotation.  (R. at 190.)  Kersey had a decreased range of motion in the lumbar spine area.  (R. at 191.)  She was very tender in the lower back

-15-

area and appeared to have significant degenerative changes of the lumbar spine with significant muscle spasm/guarding. (R. at 191.) Kersey's functional deficits included sleep disturbances, inability to ambulate or prolong sit for more than one to two hours without increased pain, difficulty lifting objects weighing 10 to 15 pounds without increased lower back pain, difficulty walking with a load without increased lower back pain, difficulty bending forward, inability to ambulate up and down stairs, decreased activities of daily living and generalized mobility due to lower back pain. (R. at 191.) It was recommended that Kersey be seen for strengthening, stretching, neuromuscular education/proprioception, pain reduction modalities, traction, TENS unit, manual therapy, mobilizations as needed and possible aquatics. (R. at 191.) Kersey's prognosis was noted as fair. (R. at 191.) Kersey continued physical therapy treatment until June 2006. (R. at 194-96.)

Kersey was examined by Dr. Kevin Sahli, M.D., for a consultative report on April 22, 2006. (R. at 197-201.) Kersey reported chief complaints of chronic lower back pain and left shoulder pain. (R. at 197.) She also indicated that her back pain was exacerbated by bending, lifting, sitting for more than two hours or sitting for more than one hour. (R. at 197-98.) Kersey reported that she could not lift any amount of weight due to her lower back pain. (R. at 198.) She stated that standing for prolonged periods caused bilateral radicular pain down the posterior aspect of her thighs. (R. at 198.) Kersey denied any lower extremity paresthesias or weakness, and she stated that she had not received any treatment or physical therapy for her lower back. (R. at 198.) As for her shoulder pain, Kersey stated that the pain worsened with flexion or abduction of the shoulder. (R. at 198.) She indicated that she could not internally or externally rotate her shoulder without pain. (R. at 198.) Kersey reported that her left

shoulder strength was limited by pain, noting that she could not sleep on her left side at night. (R. at 198.)

Upon physical examination, Dr. Sahli noted that Kersey was alert, oriented and in no acute distress. (R. at 199.) Kersey sat comfortably throughout the examination and had no difficulty getting on and off the examination table. (R. at 199.) Kersey had swollen equal radial and dorsalis pedis pulses bilaterally. (R. at 199.) Her gait was described as grossly normal, but there was a mild imbalance on tandem gait with full weight-bearing on the left lower extremity. (R. at 199.) She was able to push up on her toes and balance without difficulty, and her finger-nose-finger, heel-to-knee and Romberg exams were all negative. (R. at 199.) Her cervical, dorsolumbar and hip joints range of motion were all within normal limits. (R. at 199-200.) A straight leg raise test was negative bilaterally for radicular symptoms, but did reproduce Kersey's lower back pain. (R. at 200.) While Kersey's range of motion in her knee, ankle and elbow joints were within normal limits bilaterally, the range of motion in her shoulder joints was reduced, particularly in the left shoulder. (R. at 200.) Kersey had a positive Neer's and Hawkins' test and impingement's sign of the left shoulder. (R. at 200.) Bilateral lumbosacral muscle tenderness and spasm was noted and there were no obvious joint fusions or deformities. (R. at 200.) Kersey had left shoulder pain with resisted external rotation and testing of the supraspinatus. (R. at 200.) Kersey had 4/5 strength testing of the supraspinatus and infraspinatus of the left shoulder, but otherwise exhibited full strength in the upper extremities. (R. at 200.) Kersey was diagnosed with chronic low back pain with a history of degenerative disc disease, mild left hip weakness with good range of motion and no reproducible radicular signs and left shoulder pain, which was possibly rotator cuff tendinitis versus

-17-

a tear.  (R. at 200.)

Based upon the physical examination, Dr. Sahli determined that, given Kersey's musculoskeletal lower back pain and mild left hip weakness, she could be expected to stand and/or walk for approximately six hours in a typical eight-hour workday with normal breaks.  (R. at 200.)  Dr. Sahli noted no restrictions on Kersey's ability to sit, as long as she was given normal breaks to stand and ambulate.  (R. at 200.)  He also noted that Kersey did not need any assistive devices.  (R. at 200.)  Due to Kersey's back pain and weakness in her left shoulder, Dr. Sahli found that she could lift and/or carry no more than 10 pounds on a frequent basis.  (R. at 200.)  He further found that Kersey could not lift overhead or reach with her left upper extremity.  (R. at 201.)  No other manipulative limitations on her ability to reach, handle, feel, grasp or finger were noted.  (R. at 201.)  Dr. Sahli determined that Kersey would be unable to perform any bending, stooping or crouching.  (R. at 201.)  No visual, communicative or environmental limitations were noted.  (R. at 201.)

Kersey was referred to Neurology Associates of Lynchburg for an evaluation and nerve conduction studies, which were performed by Dr. Charles R. Joseph, M.D., on July 12, 2006.  (R. at 224-26.)  Dr. Joseph noted that Kersey complained of increasing back pain, which originally centered in the right paraspinal area.  (R. at 224.)  However, Kersey explained that the pain had moved to the left side and radiated down to the left leg.  (R. at 224.)  Kersey indicated that her symptoms were caused by movements such as twisting and turning.  (R. at 224.)  Dr. Joseph referenced past MRI findings that suggested some disc bulging, but he noted that the findings showed no evidence of significant nerve root compression.  (R. at 224.)  Upon examination,

-18-

Kersey displayed normal power in the proximal and distal upper and lower extremities in all muscle groups. (R. at 224.) Sensory testing was intact to pinprick throughout and Kersey's reflex was 1+ at the knees and ankles without pathologic reflex. (R. at 224.) Nerve conduction studies showed a normal left peroneal motor velocity in the amplitude and F-wave latency. (R. at 224.) A needle examination of the left L4 through S1 myotomes and right anterior tibialis was unremarkable. (R. at 224.) Therefore, Dr. Joseph concluded that there was no evidence of neuropathy or radiculopathy in the lower extremities, either clinically or electrically. (R. at 224.) He noted that her back pain certainly suggested an ongoing "mechanical process." (R. at 224.) Dr. Joseph also noted that Kersey's urinary symptoms were non-neurologic in origin. (R. at 224.)

On October 11, 2006, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a PRFC assessment finding that Kersey could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 228.) Dr. Surrusco determined that Kersey was limited in her ability to push and/or pull in her upper extremities, particularly her left upper extremity, noting that she could only occasionally push and/or pull with her left upper extremity. (R. at 228.) Dr. Surrusco found that Kersey could occasionally climb stairs, use ramps, balance, stoop, kneel, crouch and crawl. (R. at 229.) However, he specifically noted that Kersey should never climb ladders, ropes or scaffolds. (R. at 229.) Dr. Surrusco noted that Kersey was limited in her ability to reach in all directions, including overhead, finding that she could only occasionally reach with her left upper extremity. (R. at 229.) No other

-19-

manipulative limitations were noted. (R. at 229.) In addition, Dr. Surrusco noted no visual, communicative or environmental limitations. (R. at 230-31.)

Kersey presented to the Lynchburg General Hospital Emergency Department on May 10, 2007, due to pain in the tailbone area. (R. at 329-40.) X-rays of the lumbar spine showed degenerative disc disease at L3-4 and L5-S1, mild levoscoliotic curvature, no subluxation in the AP plane and no facet joint abnormality was observed. (R. at 331.) Kersey was prescribed Lortab. (R. at 333.) Kersey presented again on June 22, 2007, complaining of bilateral numbness in her feet, chest pain and difficulty breathing. (R. at 317-28.) A chest x-ray revealed normal findings. (R. at 326.)

Kersey again sought treatment at Lynchburg General Hospital Emergency Department on August 19, 2007. (R. at 289-316.) Kersey complained of chest pain, dizziness, lightheadedness and nausea. (R. at 308.) She explained that the chest pain was a stabbing pain that radiated into her bilateral shoulders and forearms. (R. at 308.) Kersey also explained that the pain was not normally associated with activity, but she acknowledged that the stabbing pain occurred when she went up stairs or walked for extended periods. (R. at 308.) A chest x-ray showed no acute process and an electrocardiogram, ("EKG"), showed a normal sinus rhythm without any acute changes. (R. at 309.) The medical assessment noted accelerated hypertension, vague, atypical chest pain, a history of GERD, a macrocytosis was noted on her complete blood count and she had mildly elevated liver functions. (R. at 310.) Kersey was admitted for overnight observation and a stress echo test was ordered. (R. at 309.) The stress test indicated a normal heart rate response and an appropriate blood

-20-

pressure response. (R. at 298.) There was no indication of chest pain and the test was terminated due to fatigue. (R. at 298.) No stress arrhythmias or conduction abnormalities were observed and the stress EKG was negative for ischemia. (R. at 298.) The overall impression showed a poor exercise tolerance and an adequate negative stress echo test. (R. at 298.) Kersey was discharged on August 20, 2007, with diagnoses of improved hypertension, vague, atypical chest pain, myocardial infarction ruled out, resolved, GERD and a urinary tract infection. (R. at 290.)

Kersey was admitted to Lynchburg General Hospital on February 8, 2008, due to dizziness and headaches. (R. at 274-87.) Kersey described the pain as throbbing and alleged symptoms of blurred vision, nausea, difficulty walking, dizziness and neck pain. (R. at 275.) She explained that the pain was exacerbated by light, noise and movement. (R. at 275.) Computerized tomography, ("CT"), scans of the brain and head showed non-specific findings that could have been secondary to small vessel ischemic disease, demyelination, vasculitis or Lyme disease. (R. at 277-78.) There was no evidence of acute territorial ischemia in a vascular distribution and there was no acute extra-axial fluid collection or intracranial hemorrhage. (R. at 277-78.) There was no midline shift or hydrocephalus, and the paranasal sinuses, mastoid air cells and middle ears were unremarkable. (R. at 277-78.) Kersey was discharged from the hospital on February 9, 2008, at which time she was prescribed Percocet. (R. at 285.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S.

458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2008).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 25, 2007, the ALJ denied Kersey's claims.  (R. at 14-25.)  The ALJ found that Kersey met the insured status requirements of the Act for DIB purposes through December 31, 2005.  (R. at 19.)  The ALJ also found that Kersey had not engaged in substantial gainful activity since September 30, 2000, the alleged onset date of disability.  (R. at 19.)  The ALJ determined that the medical evidence established that Kersey suffered from severe impairments, namely

degenerative disc disease and degenerative joint disease of the left shoulder. (R. at 19.) However, he found that Kersey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ determined that, after consideration of the medical evidence, Kersey retained the residual functional capacity to perform a full range of light, unskilled work. (R. at 20.) In addition, the ALJ found that Kersey was capable of performing her past relevant work as a deli clerk and cashier, noting that the past work did not require the performance of work-related activities precluded by her residual functional capacity. (R. at 24.) Thus, the ALJ concluded that Kersey was not under a disability as defined in the Act and was not entitled to benefits. (R. at 25.)

Kersey argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-17.) In particular, Kersey contends that the ALJ's residual functional capacity finding is not supported by substantial evidence because evidence of record shows that she is more physically and mentally limited than found by the ALJ. (Plaintiff's Brief at 9-17.) Kersey argues that, due to the fact that the record contains no medical opinion regarding her mental limitations, the ALJ erred by not ordering a consultative examination. (Plaintiff's Brief at 10-11.) Kersey also argues that the ALJ erroneously rejected every medical opinion of record regarding her work-related physical limitations. (Plaintiff's Brief at 12-17.) According to Kersey, by rejecting or ignoring the medical opinions within the record, the ALJ essentially made a finding that he was not qualified to make, as it was unsupported by evidence of record. (Plaintiff's Brief at 12-17.) Lastly, Kersey contends that the ALJ failed to properly address all medical

-23-

opinions of record and adequately explain his rationale for rejecting those medical opinions.  (Plaintiff's Brief at 16-18.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Kersey's argument that the ALJ erred by failing to order a consultative examination to assess her mental impairments.  According to

-24-

Kersey, by failing to order the consultative examination when there was no other mental evaluation contained in the record, the ALJ essentially substituted his opinion for that of a trained mental health professional. (Plaintiff's Brief at 10-11.) After a review of the ALJ's written opinion and the evidence of record, I agree.

According to the regulations, a consultative examination can be ordered by the ALJ once he has given "full consideration to whether the additional information needed . . . is readily available from the records of [the claimant's] medical sources." 20 C.F.R. §§ 404.1519(a)(1), 416.919(a)(1) (2008). Prior to ordering a consultative examination, the ALJ "will consider not only existing medical reports, but also the disability interview form containing [the claimant's] allegations as well as other pertinent evidence in [the claimant's] file." 20 C.F.R. §§ 404.1519(a)(1), 416.919(a)(1) (2008). A consultative examination is obtained in order to resolve any conflicts or ambiguities within the record, as well as "to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for decision." 20 C.F.R. §§ 404.1519(a)(2), 416.919(a)(2) (2008). A consultative examination must be ordered "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim." 20 C.F.R. §§ 404.1519(b), 416.919(b) (2008).

Additionally, the United States Court of Appeals for the Fourth Circuit has ruled that the ALJ has a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the

claimant when that evidence is inadequate." *Cook*, 783 F.2d at 1173. The regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and severity of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2008).

In this case, the ALJ determined that Kersey retained the residual functional capacity to perform a full range of light work with no specific limitations as to her alleged mental impairments. (R. at 20.) In fact, in rendering his decision, the ALJ concluded that Kersey's alleged panic disorder was a non-severe impairment. (R. at 20.) The ALJ noted the medical records revealed that, since November 2001, Kersey had rarely complained of such symptoms. (R. at 20.) He further noted that Kersey had not been hospitalized for treatment of any mental condition and that she had no history of treatment from a mental health professional. (R. at 20.) Lastly, the ALJ opined that, based upon the evidence of record, Kersey's alleged mental impairment failed to significantly limit her activities of daily living or her ability to understand and remember simple instructions, communicate with others and act in her own best interests. (R. at 20.)

The court is aware that there is minimal evidence contained in the record pertaining to Kersey's mental condition. In particular, as noted by the ALJ, Kersey has not received treatment from a mental health professional. However, the record does show that Kersey complained of psychiatric symptoms during the relevant time period. On November 11, 2001, Kersey complained of continuous feelings of anxiousness, symptoms of panic disorder and she expressed concern that she was

-26-

experiencing panic attacks. (R. at 160.) Thus, in order to address these symptoms, Kersey was placed on Zoloft for a trial period. (R. at 160.) On February 28, 2002, Kersey reported that she did not want to continue taking Zoloft, noting that it had not helped her panic problems. (R. at 159.) As a result, Kersey was prescribed Prozac to treat her anxiousness and panic attacks. (R. at 159.) As of July 2006, Kersey was taking Effexor, which is commonly used to treat depression and anxiety. (R. at 250.) However, despite continued symptoms, Kersey reported that she discontinued the use of the medication due to the fact that it caused feelings of paranoia and caused her to be very agitated and irritable. (R. at 250.) Furthermore, at the April 25, 2007, ALJ hearing, Kersey alleged that she experienced panic attacks once or twice a week. (R. at 357.) She testified that she avoided driving due to the panic attacks, noting that the attacks impacted her ability to function. (R. at 355.)

The record is devoid of any opinion evidence regarding Kersey's alleged mental impairments and limitations. As stated above, in determining whether a consultative examination is necessary, the ALJ must not only consider the existing medical reports, but he also should consider the claimant's allegations contained in the disability interview form. *See* 20 C.F.R. §§ 404.1519(a)(1), 416.919(a)(1) (2008). In Kersey's disability interview form, she not only alleged physical impairments, but she also specifically alleged disability due to nervousness, panic attacks, inability to concentrate and forgetfulness. (R. at 91, 106.) The undersigned acknowledges that the regulations certainly give the ALJ discretion in determining whether to obtain a consultative examination. However, as previously discussed, a consultative examination *must* be ordered when there is insufficient evidence to support the claim. *See* 20 C.F.R. §§ 404.1519(b), 416.919(b) (2008). Therefore, although the medical

-27-

evidence of record contains minimal complaints and treatment related to Kersey's alleged mental impairments, the fact that Kersey alleged disability due to, among other things, psychiatric-related problems and was treated for such problems, suggests that the ALJ had a duty to further inquire. As such, it is the court's opinion that, due to the lack of any medical opinions regarding Kersey's alleged mental impairments, the ALJ should have ordered a consultative examination.

The undersigned recognizes that the results of a consultative mental examination may not have altered the ALJ's residual functional capacity determination. Nonetheless, based upon Kersey's allegations of disability, as well as her treatment for mental-related impairments during the relevant time period in question, it is possible that a consultative examination would have revealed findings that may have caused the ALJ to place further restrictions on Kersey's residual functional capacity. Consequently, further restrictions on Kersey's residual functional capacity may have reduced or eliminated the number of available jobs that she could perform.

Furthermore, the court notes that, "[i]n the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of [a claimant's] psychiatric problems for that of a trained professional." *Grimmet v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). In this case, there was no psychiatric or psychological evidence to support the ALJ's decision that Kersey's alleged mental impairments were non-severe. Thus, by making such a finding, under circumstances where the record

-28-

did not contain any medical opinion assessing Kersey's mental impairments, the court is of the opinion that the ALJ erred by substituting his opinion for that of a trained mental health professional.  Accordingly, the ALJ's finding with respect to Kersey's mental impairments is not supported by substantial evidence.

Next, Kersey contends that the ALJ also erred in his evaluation of her physical impairments.  (R. at 12-15.)  Just as she argued with regard to her mental impairments, Kersey claims that, in considering her physical impairments, the ALJ substituted his opinion for that of a trained medical profession, as his residual functional capacity finding rejected all of the relevant medical opinions of record.  (R. at 12-15.)  Kersey specifically claims that the evidence of record indicates that she suffered from work-related limitations, namely a severe left shoulder impairment that renders her unable to perform a full range of light, unskilled work.  (R. at 12-15.)  After a review of the record, I agree.

An examination of the opinion evidence of record shows that four separate opinions were rendered regarding Kersey's physical impairments and how they impacted her ability to perform work-related tasks.   First, the opinion of Dr. Woalckam, which was summarily rejected as being contrary to the medical evidence of record, contained several very strict limitations on Kersey's physical capabilities. (R. at 151-52.)  On July 27, 2001, Dr. Woalckam determined that Kersey could lift less than 10 pounds, sit for two to three hours, stand for two hours, walk for two hours and drive for two to three hours.  (R. at 151.)  Dr. Woalckam further noted that Kersey would have difficulty stooping and a minimal ability to bend.  (R. at 151.)  According to the medical evaluation, Kersey's impairments rendered her unable to participate in

-29-

a job search, job skills training, education classroom instruction, job readiness training, work experience or employment. (R. at 152.) In addition, it was noted that Kersey was unable to handle small children. (R. at 152.) The medical evaluation indicated that Dr. Woalckam had advised Kersey to either quit her job, reduce her work hours or take a leave of absence due to health reasons. (R. at 152.) Dr. Woalckam reported that, at the end of the treatment period, Kersey would not be able to work, as he found that her limitations were permanent. (R. at 152.) While the court notes that the ALJ's failure to discuss certain portions of the above findings is questionable, the undersigned is of the opinion that the ALJ's decision to accord minimal weight to this opinion is justified, as Dr. Woalckam's opinion contains findings contrary to, and more restrictive than, the other evidence of record.

The record also contains a PRFC dated April 13, 2006, which was completed by state agency physician Dr. Blount. (R. at 183-89.) Dr. Blount found that Kersey was able to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 184.) Dr. Blount further found that Kersey was unlimited in her ability to push and/or pull and that she could frequently balance, but only occasionally climb, stoop, kneel, crouch and crawl. (R. at 185.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 186.) Dr. Blount noted that there were treating/examining source opinions within the record that were significantly different from his findings, but noted that such opinions were not persuasive because they were not supported by the evidence of record. (R. at 187, 189.) Dr. Blount determined that Kersey's allegations were only partially credible.

-30-

(R. at 188.)  Notably, the ALJ failed to discuss or reference this particular state agency opinion.  While the ALJ did note that he considered the opinions of the "state agency physicians" plural, he only cited to and specifically referenced Dr. Surrusco's findings, not the findings of Dr. Blount.  (R. at 24.)

Despite the ALJ's failure to discuss and analyze this particular medical opinion, it is important to acknowledge that Dr. Blount's findings are, for the most part, consistent with the ALJ's findings.  Thus, consideration of this particular opinion would not have resulted in further limitations to Kersey's residual functional capacity.  Therefore, the court is of the opinion that the ALJ's failure to specifically discuss Dr. Blount's opinion constitutes a harmless error.  Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001)) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

On April 22, 2006, a consultative examination was performed by Dr. Sahli. (R. at 197-201.)  Kersey was diagnosed with chronic low back pain with a history of degenerative disc disease, mild left hip weakness with good range of motion and no reproducible radicular signs and left shoulder pain, which was possibly rotator cuff tendinitis versus a tear.  (R. at 200.)  Dr. Sahli determined that, given Kersey's musculoskeletal lower back pain and mild left hip weakness, she could be expected

-31-

to stand and/or walk for approximately six hours in a typical eight-hour workday with normal breaks. (R. at 200.) Dr. Sahli noted no restrictions on Kersey's ability to sit, as long as she was given normal breaks to stand and ambulate. (R. at 200.) He also noted that Kersey did not need any assistive devices. (R. at 200.) Due to Kersey's back pain and weakness in her left shoulder, Dr. Sahli found that she could lift and/or carry no more than 10 pounds on a frequent basis. (R. at 200.) He further found that Kersey could not lift overhead or reach with her left upper extremity. (R. at 201.) No other manipulative limitations on her ability to reach, handle, feel, grasp or finger were noted. (R. at 201.) Dr. Sahli determined that Kersey would be unable to perform any bending, stooping or crouching. (R. at 201.) No visual, communicative or environmental limitations were noted. (R. at 201.) In discussing this particular opinion, the ALJ stated that although he agreed that Kersey could perform light work, he disagreed with Dr. Sahli's opinion that Kersey was unable to perform any bending, stooping or crouching. (R. at 24.) Accordingly, the ALJ gave minimal weight to that portion of Dr. Sahli's medical opinion. (R. at 24.) Therefore, it is only reasonable to conclude that the ALJ accepted Dr. Sahli's remaining findings, including the finding that Kersey was unable to lift overhead or reach with her left upper extremity.

The final opinion evidence in the record is a PRFC completed by Dr. Surrusco on October 11, 2006, in which he found that could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 228.) Dr. Surrusco determined that Kersey was limited in her ability to push and/or pull in her upper extremities, particularly her left upper extremity, noting that she could only

-32-

occasionally push and/or pull with her left upper extremity. (R. at 228.) Dr. Surrusco found that Kersey could occasionally climb stairs, use ramps, balance, stoop, kneel, crouch and crawl. (R. at 229.) However, he specifically noted that Kersey should never climb ladders, ropes or scaffolds. (R. at 229.) Dr. Surrusco noted that Kersey was limited in her ability to reach in all directions, including overhead, finding that she could only occasionally reach with her left upper extremity. (R. at 229.) No other manipulative limitations were noted. (R. at 229.) In addition, Dr. Surrusco noted no visual, communicative or environmental limitations. (R. at 230-31.) In the ALJ's written opinion, he noted that he agreed with Dr. Surrusco's opinion. (R. at 24.)

In the case at hand, the ALJ found that Kersey retained the residual functional capacity to perform a full range of light, unskilled work. (R. at 20.) Thus, he concluded that Kersey was capable of performing her past relevant work as a deli clerk and cashier, noting that her past work did not require the performance of work-related activities precluded by his residual functional capacity finding. (R. at 24.) In the regulations, light work is defined as work involving "lifting no more than 20 pounds at a time with frequently lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008). The regulations further explain that "[e]ven though the weight lifted may be very little, a job is in [the light] category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008). In order to be considered capable of performing a full or wide range of light work, as found by the ALJ in this case, a claimant "must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

-33-

First, the court recognizes that the ALJ plainly stated that he agreed with Dr. Surrusco's opinion that Kersey was limited to light work. (R. at 24.) However, the ALJ did not reference all of Dr. Surrusco's findings. (R. at 24.) In fact, the ALJ failed to discuss the postural limitations noted by Dr. Surrusco, which indicated that Kersey could only occasionally climb stairs, use ramps, balance, stoop, kneel, crouch and crawl and that she should never climb ladders, ropes or scaffolds. (R. at 229.) Despite the fact that the ALJ neither mentioned these limitations in his written opinion nor specifically included them in his residual functional capacity finding, the court is of the opinion that failure to do so merely constitutes a harmless error. *See Austin*, 2007 WL 3070601, *6 .

Social Security Ruling 85-15 states that stooping, kneeling, crouching and crawling "are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending." *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Social Security Ruling 85-15 further states that stooping, which is defined as bending the body downward and forward by bending the spine at the waist, is required to do almost any kind of work, especially when objects below the waist are involved. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). The ruling explains that "[i]f a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Moreover, Social Security Ruling 85-15 clarifies that crawling on the hands, knees and feet is a relatively rare activity even in arduous work, therefore, any limitations on the ability to crawl would

-34-

be of little significance in the broad world of work.  *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).    Similarly, limitations as to the ability to kneel, which is defined as bending the legs at the knees to come to a rest on one or both knees, would also be of little significance in the workplace.    *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).  The ability to crouch is mostly associated medium, heavy and very heavy jobs.  *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).  Thus, as explained in Social Security Ruling 83-14, "to perform substantially all of the exertional requirements of most . . . light jobs, a person would not need to crouch."  *See* S.S.R. 83-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).  Social Security Ruling 85-15 explains that limitations in climbing and balancing can have different effects on the occupational base depending on the degree of the limitation and the type of job, and that the performance of the light occupation of construction painter *may* be ruled out.  *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992) (emphasis added).  However, there is nothing to suggest that a restriction as to climbing would preclude the ability to perform "substantially all" remaining light occupations.  As such, the ALJ's failure to specifically discuss these findings and include the postural limitations in his formal residual functional capacity finding constitutes, at most, harmless error not requiring remand, as these limitations were essentially included in the ALJ's finding that Kersey maintains the ability to perform a full range of light work.

Next, the court will address Kersey's contention that the ALJ erred in according minimal weight to Dr. Sahli's opinion that she could not bend, stoop or crouch.  This

-35-

argument is without merit. Dr. Sahli's opinion as to these postural limitations is not supported by the other opinion evidence of record. Moreover, the treatment notes and other medical evidence does not suggest a total restriction from bending, stooping or crouching. The state agency physicians agreed that Kersey was limited to only occasional balancing, stooping, kneeling, crouching and crawling. Thus, the undersigned is of the opinion that the ALJ's decision to accord minimal weight to this portion of Dr. Sahli's opinion is supported by substantial evidence.

Although the court is of the opinion that substantial evidence supports the ALJ's findings with regard to the opinion Dr. Woalckam, as well as the findings pertaining to portions of Dr. Surrusco's and Dr. Sahli's opinions, the court finds that the ALJ erred in the remainder of his evaluation of Kersey's physical impairments. As discussed above, Dr. Sahli determined that Kersey was unable to perform any overhead lifting or reaching with her left upper extremity. (R. at 24.) Similarly, Dr. Surrusco found that Kersey was limited to only occasional pushing and/or pulling with the left upper extremity and occasional reaching in all directions, including overhead, with the left upper extremity. (R. at 228-29.) Furthermore, the treatment notes show that Kersey consistently complained of left shoulder pain and discomfort. Notably, the ALJ did not specifically reject or accord lesser weight to these portions of Dr. Surrusco's and Dr. Sahli's opinions. Therefore, because the ALJ stated he agreed with the state agency physicians and Dr. Sahli that Kersey was capable of performing light work, it is only reasonable to assume that the ALJ essentially adopted the opinions as to Kersey's upper extremity limitations, concluding that such limitations were encompassed in his finding that Kersey could perform light work.

-36-

Social Security Ruling 85-15 states that "[r]eaching (extending the hands and arms in any direction) and handling . . . are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do." *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). While there is nothing within the record to suggest that Kersey's past relevant work required a great deal of overhead reaching, I am of the opinion that the ALJ erred by not precisely outlining Kersey's left upper extremity limitations in his residual functional capacity finding. The ALJ concluded that Kersey not only could perform her past relevant work as a deli clerk and as a cashier, but he also found that she retained the residual functional capacity to perform a full range of light, unskilled work. (R. at 20-25.) As mentioned above, because reaching is an activity that is required in almost every job, the fact that the ALJ adopted medical opinions that either completely prohibited overhead reaching or limited Kersey's ability to reach with her left upper extremity indicates that her ability to perform a large number of occupations may be reduced, thereby rendering Kersey unable to perform a full range of light, unskilled work. Thus, the undersigned is of the opinion that substantial evidence does not support the ALJ's decision because he failed to include these specific limitations in his residual functional capacity finding.

Furthermore, the court notes that varying degrees of limitations on one's ability to reach would have different effects on a claimant's ability to work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). For that reason, according to Social Security Ruling 85-15, the assistance of a vocational expert may be needed to determine the effects of the limitations on a

-37-

claimant's ability to work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). However, in this case, although a vocational expert did testify at the ALJ hearing, he merely identified the exertional levels of Kersey's past relevant work. There was no inquiry or testimony as to how Kersey's impairments may impact her ability to perform work-related activities. The court recognizes that, in general, the use of vocational expert testimony is necessary only when it is determined that a claimant cannot return to her past relevant work. *See generally Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983.) Nonetheless, considering the circumstances of this case, the court is of the opinion that expert testimony was necessary to determine if Kersey's past work as a deli clerk and as a cashier required overhead reaching and use of the upper extremities. Therefore, based on the ALJ's erroneous evaluation of Kersey's physical impairments, the court also finds that the ALJ's conclusion that Kersey could perform her past relevant work is not supported by substantial evidence.

Accordingly, this case shall be remanded for further development of the record and for further consideration of Kersey's mental and physical impairments. In addition, considering the ALJ's improper evaluation of Kersey's mental and physical impairments, the court instructs the Commissioner that vocational expert testimony is necessary to assess the impact of Kersey's impairments on her ability to perform her past relevant work.

## IV. Conclusion

For the foregoing reasons, Kersey's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the

Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:     This 24th day of March 2009.

/s/  *Glen M. Williams*
SENIOR UNITED STATES DISTRICT JUDGE